UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

United States of America,

        Plaintiff,

v.                                                                    Mag. No. 07-339 (RLE)
                                                                     ORDER
Steven Alan Taylor,

        Defendant.

      A superseding misdemeanor information charged Defendant Steven Alan Taylor with two counts of knowingly taking a gray wolf without permission in Minnesota in violation of 16 U.S.C. §§ 1538(a)(1)(G), 1540(b)(1) and 50 C.F.R. § 17.40(d)(2)(i).[1]  Defendant was found guilty on count one and not guilty on count two after a one-day bench trial before the Honorable Raymond L. Erickson, Chief United States Magistrate Judge, which was conducted pursuant to Defendant's consent and 18 U.S.C. § 3401(b).  On September 3, 2008, Defendant was sentenced to two years probation.  Defendant now appeals his conviction under Federal Rule of Criminal Procedure 58(g)(2)(B).

## I.      BACKGROUND

      On December 12, 2002, Marty Stage, a game warden for the Minnesota Department of Natural Resources, discovered a gray wolf carcass in a remote area outside of Isabella,

---

[1]      It is unlawful for any person to knowingly "violate any regulation pertaining to . . . any threatened species of fish or wildlife listed pursuant to section 1533 of [title 16 of the United States Code] and promulgated by the Secretary [of the Interior] pursuant to authority provided by [Chapter 35]."  16 U.S.C. §§ 1538(a)(1)(G), 1540(b)(1).  Subject to certain exceptions, "no person may take a gray wolf in Minnesota."  50 C.F.R. § 17.40(d)(2)(i) (2002).  "The term 'take' means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."  16 U.S.C. § 1532(19).

Minnesota.[2]  (Trial Tr. at 152-53.)  The carcass was on a hill approximately sixty yards from a

tree stand that showed signs of recent use.  (*Id.* at 153-56.)  The carcass's location on the hill

caused it to be at approximately the same elevation as the tree stand.  (*Id.* at 160-61.)  Stage

noted that the ground underneath the wolf carcass was "not frosty" and that the hair on the side

of the carcass touching the ground was not matted or wet.  (*Id.* at 157.)  As a result, Stage

concluded that the "wolf died before snow."  (*Id.*)  Stage also located two shell casings from a

30.06 rifle three feet from the tree stand.  The casings did not have ice on them and were "shiny

and bright," indicating that they had fallen recently onto ground without snow.  (*Id.* at 157-58.)

Upon further examination of the carcass, Stage found that the wolf had been shot through the

heart with the bullet passing "straight through, horizontally through the body of the wolf."  (*Id.* at

159-60.)

       After speaking with local law enforcement personnel, Stage decided to postpone further

investigation until the following deer hunting season.  (*Id.* at 163-64.)  Stage returned to the area

on November 9, 2003, and encountered Bradley Nauer in the tree stand.  (*Id.* at 165-67.)  Stage

spoke with Nauer, seized his 30.06 semiautomatic rifle, and interviewed a number of other

individuals, including Peter Joise and Donald Luebesmier.  (*Id.* at 167.)  Luebesmier initially

denied owning a 30.06 rifle.  (*Id.* at 32.)  The following day, however, Luebesmier informed

Stage that he owned a 30.06 rifle and began cooperating in the investigation.  (*Id.* at 33-34.)

Soon thereafter, Stage transferred the investigation to Bradley Merrill, a special agent with the

United States Fish and Wildlife Service, who learned that Defendant had hunted near the tree

stand during the third week in November 2002 with Nauer, Luebesmier, and Joise.  It was also

---

[2]       A DNA sample of the carcass later confirmed Stage's initial identification of the gray
wolf.  (Trial Tr. at 95, 206.)

later determined that the shell casings found near the tree stand came from neither Nauer's nor Luebesmier's rifles.  (*Id.* at 210.)

At trial, Luebesmier testified that he, Defendant, Nauer, and Joise hunted together during the third week in November 2002.  At that time, the hunters had only one remaining deer tag, which limited them to killing one deer between the four of them.  (*Id.* at 23-24.)  On the last day of the deer hunt, Luebesmier was hunting on the south end of a small lake and Defendant was hunting from the tree stand toward the north end of the lake roughly a quarter of a mile away.  After hearing two gun shots, Luebesmier stopped hunting until he could determine if a deer had been killed.  Upon meeting Defendant and Nauer, Luebesmier asked whether either hunter had got "him."  (*Id.* at 26.)  Defendant responded "I got two of them."  (*Id.*)  Luebesmier then questioned how many deer tags remained, and Defendant responded that he had shot two wolves, not two deer.  (*Id.*; *see also id.* at 87.)   Luebesmier further testified that he believed Defendant was using a 30.06 semiautomatic rifle and that the following year Defendant told him that he had disposed of the rifle after cutting it into foot-long pieces.  (*Id.* at 28-30.)

The only other member of the hunting party to testify at trial was Nauer.[3]  According to Nauer's testimony, Defendant was hunting from the tree stand with a 30.06 rifle; Nauer heard two shots; Nauer and Defendant later met for lunch; and, at lunch, Defendant said that he had "shot a dog."  (*Id.* at 103.)  Asked what he thought Defendant meant by "dog," Nauer responded "I was hoping it wasn't a timber wolf, but there's coyotes up there, too, so – plus I had seen a black lab one time while I was up there, too."[4]  (*Id.* at 104.)  Later, Nauer confirmed that he testified before the grand jury that he "figured" Defendant was referring to a wolf.  (*Id.* at 110.)

---

[3]     Joise was killed in a hunting accident during the 2003 hunting season.

[4]     "Timber wolf" and "gray wolf" are interchangeable.  (*See id.* at 152-53.)

Nauer also testified that he was snowmobiling in the same area in early 2003 with Defendant and saw a carcass that "kind of looked like a dog" near the tree stand. (*Id.* at 106, 143-44.)

After receiving post-trial submissions from the parties, the magistrate judge found Defendant guilty on count one and not guilty on count two of the misdemeanor superseding information.[5] Specifically, the magistrate judge found proof beyond a reasonable doubt that Defendant killed the gray wolf found by Stage but that reasonable doubt existed as to whether the carcass viewed by Nauer and Defendant in early 2003 was a gray wolf. (Doc. No. 42 at 43-44.) Defendant timely appealed his conviction.

## II.    DISCUSSION

"A defendant may appeal a magistrate judge's judgment of conviction or sentence to a district judge…." Fed. R. Crim. P. 58(g)(2)(B). "The scope of the appeal is the same as in an appeal to the court of appeals from a judgment entered by a district judge." Fed. R. Crim. P. 58(g)(2)(D).

### A.    Sufficiency of the evidence

Defendant first argues that his conviction is not supported by sufficient evidence. A court may reverse a conviction for insufficiency of the evidence "only upon a demonstration that a rational jury would have had no choice but reasonably to doubt the existence of an element of a charged crime." *United States v. White*, 506 F.3d 635, 641 (8th Cir. 2007) (quotation omitted). This standard of review is "very strict" and a verdict will "not be overturned lightly." *United States v. Anderson*, 570 F.3d 1025, 1029 (8th Cir. 2009) (quotation omitted). In determining whether a verdict is supported by sufficient evidence, a court "examine[s] the evidence in the

---

[5]    The government clarified before the trial that count one of the superseding misdemeanor information related to the gray wolf carcass retrieved by Stage in December 2002 and that count two related to the animal carcass observed by Nauer and Defendant in early 2003. (*Id.* at 11.)

light most favorable to the jury verdict and give[s] the verdict the benefit of all reasonable inferences." *Id.* (quotation omitted). Identical standards apply to a court's review of a conviction after a bench trial and a jury trial. *White*, 506 F.3d at 641.

In this case, the magistrate judge painstakingly detailed the evidence presented at trial and found "Luebesmier's testimony believable in all material respects." (Doc. No. 42 at 39.) The Court cannot second-guess the magistrate judge's credibility determinations, *United States v. Birdine*, 515 F.3d 842, 844 (8th Cir. 2008), and Luebesmier's testimony alone supports Defendant's conviction. *Cf. United States v. Bounmy*, 403 F.3d 1018, 1021 (8th Cir. 2005) ("[T]he uncorroborated testimony of an accomplice is sufficient to sustain a conviction if it is not otherwise incredible or unsubstantial on its face."). Furthermore, Nauer corroborated the material aspects of Luebesmier's testimony, and the location of the wolf carcass, trajectory of the bullet, and the location of the 30.06 shell casings were consistent with the wolf being shot from the tree stand occupied by Defendant during the third week in November 2002.[6]

Defendant also maintains that his conviction is not supported by substantial evidence because the magistrate judge applied the wrong burden of proof. The magistrate judge's extensive recitation of the correct burden of proof and application of that burden, however, belies Defendant's argument. (*See* Doc. No. 42 at 34-45.) Indeed, the magistrate judge's finding of

---

[6]      A photograph depicting snow on the ground allegedly at the end of the 2002 hunting season was admitted at trial. In reviewing the photograph, Stage testified that he had no reason to doubt that the photograph accurately represented the conditions at the end of the 2002 hunting season because "we had snow." (Trial Tr. at 183.) Based on Stage's conclusion that the wolf died when there was no snow on the ground, this evidence weighs against Defendant's conviction. The magistrate judge's meticulous review of the evidence, however, disclosed that the photograph was actually taken in November 2000. Consequently, the magistrate judge discounted Stage's testimony related to the photograph and snowfall in 2002, and determined that it did not create reasonable doubt as to Defendant's guilt. (Doc. No. 42 at 42 n.10.) Likewise, the Court determines that Stage's testimony does not render the evidence insufficient to support Defendant's conviction.

reasonable doubt on count two of the superseding misdemeanor information reflects proper application of the burden proof. Therefore, the Court determines that Defendant's conviction is supported by sufficient evidence.

**B.     Discovery allegations**

Defendant also argues that his conviction must be set aside because the government failed to disclose certain material evidence favorable to the defense as required by *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972). During Merrill's cross examination, Defendant's counsel elicited testimony suggesting that the government had not disclosed evidence of a conspiracy-to-commit-perjury investigation related to Nauer's prior testimony before the grand jury. After permitting Defendant's counsel to develop the record, the magistrate judge invited the parties to address the alleged discovery violation in written summations. (*See* Trial Tr. at 214-242, 249.) Defendant's written summation referred to the government's alleged violation but nowhere argued that the violation required dismissal, acquittal, or a new trial. (*See* Doc. No. 40.) Moreover, Defendant produced no evidence to contradict the government's claim that all relevant evidence had been provided to Defendant. Consequently, the magistrate judge held that "any *Brady* or *Giglio* claim ha[d] either been abandoned, or is without merit." (Doc. No. 42 at 41 n.8.) Nevertheless, to support his motions for judgment of acquittal and a new trial, Defendant noted that "critical impeaching evidence regarding the prosecution's witnesses was not provided to the defense as required by due process, rule and precedent." (Doc. No. 44.) Defendant, however, failed to support this assertion with additional evidence and later withdrew the argument on the record. (*See* Doc. No. 54 at 5-6.) Defendant now identifies as an issue on appeal whether "the government fail[ed] to provide Brady/Giglio material." (Doc. No. 55 at 2.) Defendant's memorandum, however,

contains only vague reference to the alleged discovery violation, does not set forth evidence contradicting the government's representation that all required materials were provided, and does not mention the magistrate judge's determination that Defendant abandoned any potential *Brady* or *Giglio* claims. Based on Defendant's representations to the magistrate judge and failure to support his arguments on appeal, the Court determines that Defendant has failed to preserve this issue for appeal. *Cf. United States v. Keltner*, 147 F.3d 662, 673 (8th Cir. 1998) (*Brady* issue not preserved for appeal because no ruling in lower court).

### III.    CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT the judgment [Doc. No. 50] is AFFIRMED.

Dated:  August 24, 2009

s/ Joan N. Ericksen
JOAN N. ERICKSEN
United States District Judge